08 CV 4611

Richard Hong (Trial Counsel) (RH – 4939)
Scott W. Friestad
David Frohlich
Melissa A. Robertson
Jeffrey B. Finnell
Thomas D. Manganello
Richard E. Simpson (RS – 5859)

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Tel:   (202) 551-4431 (Hong)
Fax:   (202) 772-9246 (Hong)
E-mail:  hongr@sec.gov



RECEIVED
MAY 19 2008
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION, :

                      Plaintiff,    :

             :

               v.           :        08 Civ._ (___)

             :

DAVID M. COLBURN, ERIC L. KELLER,    :      **COMPLAINT**
JAMES F. MacGUIDWIN, and JAY B.      :
RAPPAPORT

             :       ECF Case

                    Defendants.   :

---

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## NATURE OF THE ACTION

1.      This is a financial fraud case against four former senior managers of America Online, Inc. ("AOL") and its successor corporation AOL Time Warner Inc.

("AOLTW" and collectively with AOL, the "Company"). Beginning in at least June
2000, David M. Colburn, Eric L. Keller and Jay B. Rappaport -- former senior managers
in the Company's Business Affairs unit ("Business Affairs") -- and James F.
MacGuidwin, former AOL controller, together with other former senior managers and
managers of the Company, participated in a scheme that artificially and materially
inflated the Company's reported online advertising revenue — a key measure by which
investors and analysts evaluated the Company.

2.      The Company fraudulently funded its own online advertising revenue by
giving counterparties the means to pay for advertising they would not have otherwise
purchased. To do so, AOL, among other things, mischaracterized the substance of the
business transactions, utilizing "round-trip" transactions, including those transactions
referenced below.

3.      As a result of the actions of senior business and financial managers and
managers of the Company, including each of the defendants, the Company reported
materially false and misleading financial results in periodic reports filed with the
Commission and other public statements from at least October 2000 through the period
ended May 2005. The Company has since restated its financial results for the fraudulent
transactions.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under Section 22(a) of the
Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e),
and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)
and (e) and 78aa]. Defendants, directly or indirectly, made use of the means or

2

instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with the transactions, acts, practices, and courses of

business alleged in this Complaint.

5.    Venue is appropriate in this Court under Section 22(a) of the Securities

Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because

the defendants and AOL did business in this judicial district and certain acts or

transactions constituting the violations occurred in this district.

## DEFENDANTS

6.    **David M. Colburn**, age 49, resides in Potomac, Maryland.  Colburn was

Executive Vice President of the Company and/or head of AOL's Business Affairs during

the relevant time period.

7.    **Eric L. Keller**, age 43, resides in McLean, Virginia.  Keller was Senior

Vice President in AOL's Business Affairs during the relevant period.

8.    **James F. MacGuidwin**, age 52, resides in McLean, Virginia.

MacGuidwin was AOL's Controller and Senior Vice President of Finance during the

relevant period.

9.    **Jay B. Rappaport**, age 43, resides in Reston, Virginia.  Rappaport was

Senior Vice President in AOL's Business Affairs during the relevant period.

### Other Relevant Party

10.    **Time Warner Inc.**, headquartered in New York, New York, is the

successor corporation of **AOL Time Warner Inc.**, which was formed by the merger of

**America Online, Inc.** and Time Warner Inc. on January 11, 2001.  AOL Time Warner

changed its name to Time Warner Inc. on October 16, 2003.  AOL Time Warner filed

3

annual, quarterly and current reports with the Commission on Forms 10-K, 10-Q, and 8-K and registered securities offerings with the Commission during the relevant time period. **AOL**, now a division of Time Warner, is an Internet service provider headquartered in New York, New York. Before it became a wholly-owned subsidiary of AOL Time Warner, AOL's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange. It filed annual, quarterly and current reports with the Commission on Forms 10-K, 10-Q, and 8-K and registered securities offerings with the Commission. The pre-merger AOL, and post-merger AOL Time Warner and Time Warner, are collectively referred to as the Company or AOL.

## FACTUAL ALLEGATIONS

11.    In the fall of 1999, AOL entered into merger discussions with Time Warner, and the two companies announced a proposed merger in January 2000. The merger closed the next year on January 11, 2001.

12.    In mid-2000, with the Time Warner merger pending, AOL faced a growing crisis with regard to its advertising revenue —a key metric.

13.    Senior business and finance managers of the Company, including Colburn, Keller, MacGuidwin and Rappaport, responded by participating in a fraudulent scheme that enabled AOL to recognize purported online advertising revenues by structuring and accounting for "round-trip" transactions – transactions in which AOL effectively funded its own advertising revenue by giving its counterparties the means to purchase AOL online advertising that the counterparties did not need or want. AOL employed a number of different types of round-trip transactions, including: (i) vendor transactions, in which

4

AOL agreed to pay inflated prices for, or forgo discounts on, goods and services it purchased in exchange for the vendors' purchases of online advertising in the amount of the markup or forgone discount; (ii) business acquisitions, in which AOL increased the price it paid to purchase businesses in exchange for the sellers' purchase of online advertising in the amount of the increase in the purchase price; and (iii) settlements of business disputes, in which AOL converted settlements of business disputes and legal claims into online advertising revenue.

14.    Keller also participated in and approved certain referral transactions, by which AOL improperly created and reported fictitious revenues.

15.    Generally accepted accounting principles ("GAAP") require accounting to reflect the substance of a transaction over its legal form. For example, revenue should not be recorded in a round-trip transaction in which the essence of the transaction is merely a circular flow of cash and the customer does not want or need the goods or services provided, would not normally purchase the goods or services at that time, or purchases quantities in excess of its needs. AOL recognized revenue on these round-trip transactions in violation of GAAP.

16.    The Company improperly and deceptively used this fraudulent online advertising revenue to falsely make it appear as if it had legitimately met or exceeded its revenue targets and to inflate and distort its actual financial results. The sham advertising transactions had a material impact on one or more of the metrics investors and analysts considered in evaluating the stock of AOL, pre-merger, and AOL Time Warner, post merger, including AOL's advertising and commerce revenue, net income, operating income and EBITDA.

17.    AOL's Business Affairs, among other things, helped negotiate these transactions that AOL employed to generate artificial online advertising revenues. AOL's senior finance and accounting managers and managers were responsible for, among other things, reviewing and approving the accounting treatment for the round-trip transactions.

18.    Colburn, Keller, MacGuidwin and Rappaport each knowingly or recklessly participated in AOL's scheme. Each defendant knew or was reckless in not knowing that these transactions were in substance not true advertising purchases, but rather, round-trip transactions employed to help AOL meet its online advertising revenue targets.

### Specific Involvement of the Defendants

19.    Colburn, a senior manager of the Company and head of Business Affairs, supervised and, in certain instances, participated in the negotiation of the round-trip transactions and signed the related agreements.

20.    Keller, a Senior Vice President in Business Affairs, supervised and participated in the negotiation of certain of the round-trip and referral transactions and signed related agreements.

21.    MacGuidwin, AOL's Controller and Senior Vice President of Finance, approved AOL's entry into certain of the round-trip transactions.

22.    Rappaport, a Senior Vice President in Business Affairs, participated in the negotiation of certain of the round-trip transactions and signed related agreements and documents.

23.    As one example of the defendants' involvement, in May and June 2000,

Colburn, Keller and Rappaport participated in and, with MacGuidwin, approved a plan to forgo a purchase discount from a hardware supplier and convert it into a purported online advertising sale to the vendor for an amount representing the forgone discount. Through this transaction, AOL artificially generated, and improperly recognized, $37.5 million of purported online advertising revenue. AOL subsequently restated its financial results to eliminate the $37.5 million from its advertising revenues.

24.     Colburn and Rappaport also participated in and, with MacGuidwin, approved a September 2000 software license transaction in which AOL agreed to trade a substantial discount on a software license purchase in return for an advertising deal in the same amount. On September 29, 2000, AOL inflated the price it paid for a software license by $20 million and converted that overpayment into a purported *bona fide* $20 million advertising purchase. Rappaport signed the contracts and later, after consultation with AOL's Accounting Policy group, signed an inaccurate audit confirmation. AOL improperly recognized the $20 million as online advertising revenue. AOL subsequently restated its financial results to eliminate the $20 million inflation from its advertising revenues.

25.     Keller also participated in AOL's improper conversion of settlements of longstanding disputes into purported advertising purchases. In August and September 2000, two companies separately agreed to settle longstanding disputes with AOL by paying AOL $12.5 million and $23.8 million, respectively. The two companies offered to pay these amounts in cash to settle outstanding disputes with AOL, without regard to any advertising purchases. Instead, AOL documented these settlement payments as purported purchases of $12.5 million and $23.8 million of online advertising. AOL

7

subsequently restated its financial results to eliminate the inflated advertising revenues from these transactions.

26.     Rappaport and Keller also participated in and, with MacGuidwin, approved a plan to convert discounts that AOL had obtained in connection with a November 2000 hardware transaction into $12 million of online advertising revenue. Business Affairs, among other things, helped devise the plan to gross-up the price AOL paid for the equipment to fund the hardware vendor's purchase of online advertising. AOL subsequently restated its financial results to eliminate the $12 million of advertising revenues from the vendor.

27.     In late 2000, Keller also supervised and participated in the improper conversion of forgone credits or rebates from an international network service provider into online advertising revenue. In order to recognize revenue, AOL began running advertising before the network provider agreed to the transaction. AOL also created its own purported ads for the network provider, linking the company name (misspelled) to a dummy web page in order to recognize revenue from the transaction. Business Affairs also promised the network provider free, bonus ads, but did not document this side agreement in the contract or deal summary.

28.     Again, in January 2001, during negotiations for a software license purchase with another software maker and licensor, Colburn directed the AOL negotiating team, which included personnel in Business Affairs, to obtain an online advertising deal. In this instance, AOL had agreed to pay $33 million to purchase a software license, even though the licensor had rejected AOL's requests that it purchase online advertising. AOL then offered, and the licensor agreed, to pay the licensor an

8

additional $4.5 million for its license in exchange for an agreement by the licensor to buy

$4.5 million of online advertising from AOL. AOL then documented the transaction as if

it consisted of two separate, *bona fide* transactions, and Colburn signed the software

contract. AOL recognized the $4.5 million as advertising revenue. AOL subsequently

restated its financial results to eliminate the $4.5 million of advertising revenues.

29.    Keller also participated in and approved certain round-trip transactions

and undisclosed side agreements involving an Internet real estate company that agreed to

refer advertisers to AOL in exchange for AOL "repping" or purchasing ads at the

company. AOL and the company used these arrangements to inflate their revenues in the

fourth quarter of 2000 and the first quarter of 2001. AOL subsequently restated its

financial results to eliminate this purported advertising revenue.

30.    Colburn also participated in transactions in 2001 with German media

company Bertelsmann, AG ("BAG"). AOL and BAG formed a joint venture in 1995 that

created AOL Europe, which owns and operates European Internet services. In March

2000, AOL agreed to purchase BAG's interest in AOL Europe in an agreement structured

as a put/call option (the "put/call"). Under the put/call, BAG could exercise an option to

"put" its AOL Europe shares to AOL by selling those shares for $6.75 billion; AOL had

an option to "call" the shares by purchasing it for $8.25 billion. The put/call gave AOL

the option to pay in cash or stock. In early 2001, BAG tried to monetize its interest in the

put/call and proposed to amend the agreement to require AOL to pay some or all of the

$6.75 billion price in cash. AOL managers, including Colburn, used BAG's need for

cash certainty to obtain BAG's agreement to re-characterize as online advertising

purchases its two payments for amendments to the put/call agreement. AOL

9

mischaracterized as advertising purchases BAG's payment of $125 million and $275 million for amendments to the put/call agreement and improperly accounted for these payments as online advertising revenue in 2001 and 2002. Colburn and other senior managers and managers approved these transactions and structured these payments as stand-alone, *bona fide* advertising purchases. The Company subsequently restated its financial results to eliminate the $400 million inflation of its advertising revenues.

31.    AOL likewise used its purchase of a corporate partner's interest in another joint venture to artificially inflate AOL's advertising revenue. In the first quarter of 2001, AOL entered into a "stock swap" through which AOL purchased the partner's 55% interest in their joint venture. With Colburn's participation, AOL structured a deal in which it agreed to pay $25 million more for the joint venture transaction with the understanding and agreement of the partner that it would enter into a $25 million online advertising contract. AOL again documented the stock swap and the ad deal as if they were two separate, *bona fide* contracts. AOL subsequently restated its financial results to eliminate the $25 million in advertising revenues.

32.    Colburn also participated in the negotiations of two transactions with a telecommunications company, through which AOL inflated its online advertising revenues by $34.2 million and $17 million in the second and fourth quarters of 2001, respectively. In the second quarter of 2001, AOL and the telecommunications company agreed to restructure an existing modem service agreement, such that AOL would forgo certain discounts and resolve a market pricing dispute. AOL had accrued a $39.2 million liability to the telecommunications company. Instead of paying the telecommunications company the $5 million that it had agreed to accept to resolve the dispute, and reversing

out the remaining $34.2 million accrued liability on its books, AOL paid the entire $39.2 million in return for telecommunications company's agreement to pay AOL $34.2 million for online advertising in June 2001 enabling AOL to inflate its online advertising revenue. AOL subsequently restated its financial results to eliminate the $34.2 million advertising revenues from this transaction.

33.     A second transaction with the same telecommunications company involved penalties that CompuServe Europe (a wholly owned subsidiary of AOL Europe) had accrued under a contract with the telecommunications company. In the fall of 2001, AOL Europe owed an estimated $17 million in penalties to the telecommunications company, and AOL Europe had accrued a $17 million liability in anticipation of the penalty payment. In negotiations with AOL in or about the fall of 2001, the telecommunications company agreed to waive the penalties in exchange for AOL adding a third year to its two-year voice/data contract for the Time Warner units. Colburn and other AOL managers convinced the telecommunications company to convert this waived penalty payment into purported online advertising revenue for AOL by having AOL pay the $17 million penalty that the telecommunications company previously offered to waive in exchange for its agreement to an additional $17 million advertising deal. AOL subsequently restated its financial results to eliminate the inflated advertising revenues from this transaction.

34.     As referenced above, AOL paid inflated prices for goods and services in the June and November 2000 hardware transactions as well as the September 2000 software and December 2000 network deals in exchange for online advertising revenue in the amount AOL overpaid. AOL's Network Operations group -- the group responsible

for running AOL's Internet service -- complained to senior managers and managers of the
Company, including MacGuidwin, about these grossed-up deals and how the payment of
inflated prices negatively impacted Network Operations and provided documents
quantifying the negative budgetary and operational impact of these inflated deals. Prior
to entry into these deals, AOL's Network Operations asked for and was promised "budget
relief" by MacGuidwin in the amount of the inflated purchase prices in the June,
September and November vendor transactions. MacGuidwin also agreed that Network
Operations could exclude from its internal cost calculations the amount that the purchase
prices on the deals were inflated (by not taking the additional discounts).

35.    MacGuidwin did not take any steps to correct the accounting impact of
such gross-ups nor did he disclose the substance or the true, contingent nature of these
transactions to Ernst & Young, LLP ("E&Y"), AOL's external auditors. Rather,
MacGuidwin and other senior finance managers signed representation letters to E&Y
claiming that the Company's advertising revenues were being properly recognized.

### FIRST CLAIM
### (Fraud Violations – Offer or Sale of AOL Stock)

#### Violations of Section 17(a) of the Securities Act Against
#### All Defendants

36.    Paragraphs 1 through 35 are realleged and incorporated herein by
reference.

37.    By engaging in the foregoing conduct alleged in the Complaint,
defendants Colburn, Keller, MacGuidwin and Rappaport, directly or indirectly, by use of
the means or instruments of transportation or communication in interstate commerce or of
the mails, in connection with the offer or sale of AOL securities: (a) employed devices,
schemes, or artifices to defraud; (b) obtained money or property by means of untrue

12

statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of securities.

38.    By reason of the foregoing, these defendants violated, and unless restrained will violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM
### (Fraud Violations – Purchase or Sale of AOL Stock)

#### Violations of Section 10(b) of the Exchange Act and
#### Exchange Act Rule 10b-5 Against All Defendants

39.    Paragraphs 1 through 35 are realleged and incorporated herein by reference.

40.    By engaging in the foregoing conduct alleged in the Complaint, defendants Colburn, Keller, MacGuidwin and Rappaport, directly or indirectly, acting knowingly or recklessly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the purchase or sale of AOL securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon any person.

41.    By reason of the foregoing, these defendants violated, and unless restrained will violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

13

## THIRD CLAIM
### (Fraud Violations – for AOL Violations)

#### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 Against All Defendants

42.    Paragraphs 1 through 35 are re-alleged and incorporated by reference.

43.    As set forth in this Complaint, AOL, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national securities exchange, in connection with the purchase or sale of AOL securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, acts, practices, or courses of business which operated as a fraud or deceit upon any person.

44.    As detailed above, defendants Colburn, Keller, MacGuidwin and Rappaport, knowingly or recklessly provided substantial assistance to AOL in its violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b.

## FOURTH CLAIM
### (Record-Keeping Violations)

#### Violation of Exchange Act Rule 13b2-1 Against All Defendants

45.    Paragraphs 1 through 35 are re-alleged and incorporated by reference.

46.    By engaging in the foregoing conduct alleged in the Complaint, defendants Colburn, Keller, MacGuidwin and Rappaport, directly or indirectly, falsified

or caused to be falsified books, records, and accounts of AOL subject to Section 13(b)(2)(A) of the Exchange Act.

47.    By reason of the foregoing, these defendants violated, and unless restrained will violate, Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### FIFTH CLAIM

#### Violations of Exchange Act Rule 13b2-2(a) Against Defendant MacGuidwin

48.    Paragraphs 1 through 35 are realleged and incorporated herein by reference.

49.    By engaging in the foregoing conduct alleged in the Complaint, defendant MacGuidwin, directly or indirectly, made or caused to be made materially false or misleading statements or omissions to an accountant or auditor.

50.    By reason of the foregoing, these defendants violated, and unless restrained will violate, Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)].

### SIXTH CLAIM
### (Reporting Violations)

#### Aiding and Abetting Violations of Section 13(a) and 13 (b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 Against All Defendants

51.    Paragraphs 1 through 35 are re-alleged and incorporated by reference.

52.    By engaging in the foregoing conduct alleged in the Complaint, defendants Colburn, Keller, MacGuidwin and Rappaport, aided and abetted AOL's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.13b2-1].

## REQUEST FOR RELIEF

The Commission respectfully requests that the Court enter an Order:

(i)     Permanently restraining and enjoining defendant Colburn from violating, directly or indirectly, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5 and 13b2-1 and from aiding and abetting violations of Sections 10(b), 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1;

(ii)    Permanently restraining and enjoining defendant Keller from violating, directly or indirectly, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5 and 13b2-1 and from aiding and abetting violations of Sections 10(b), 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1;

(iii)   Permanently restraining and enjoining defendant MacGuidwin from violating, directly or indirectly, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5, 13b2-1 and 13b2-2(a) and from aiding and abetting violations of Sections 10(b), 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1;

(iv)    Permanently restraining and enjoining defendant Rappaport from violating, directly or indirectly, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5, 13b2-1 and from aiding and

16

abetting violations of Sections 10(b), 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1;

(v)     Ordering all defendants to disgorge ill-gotten gains, including pre-judgment and post-judgment interest, resulting from the violations alleged in this Complaint;

(vi)    Ordering all defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(vii)   Ordering that defendants Colburn and MacGuidwin, under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], are prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(viii)   Granting such other relief as the Court deems just and appropriate.

Dated:  May 19, 2008

Respectfully submitted,

*R. Hong*

Richard Hong (Trial Counsel) (RH – 4939)
Scott W. Friestad
David Frohlich
Melissa A. Robertson
Jeffrey B. Finnell
Thomas D. Manganello
Richard E. Simpson (RS – 5859)

Attorneys for Plaintiff
Securities and Exchange Commission
100 F. Street, N.E.
Washington, DC  20549-0911
(202) 551-4431 (Hong)
hongr@sec.gov